UNITED STATES of America and Robert G. Hackett, Special Agent of the Internal Revenue Service, Appellants/Cross–Appellees,

v.

ROCKWELL INTERNATIONAL, Appellee/Cross Appellant.

Appeal of UNITED STATES of America and Robert G. Hackett, in No. 88–3852.

Appeal of ROCKWELL INTERNATIONAL, in 89–3009.

Nos. 88–3852, 89–3009.

United States Court of Appeals, Third Circuit.

Argued July 10, 1989.

Decided March 12, 1990.

---

James I.K. Knapp, Acting Asst. Atty. Gen., Charles E. Brookhart (argued), Gary R. Allen, and Janet A. Bradley, Tax Div., Dept. of Justice, Washington, D.C., for appellants/cross appellees.

Joseph A. Katarincic (argued), Katarincic, Salmon & Steele, Pittsburgh, Pa., for appellee/cross appellant.

Before HIGGINBOTHAM, BECKER and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This opinion addresses cross appeals by the United States and Internal Revenue Service Special Agent Robert Hackett, and by Rockwell International Corporation, from an order of the district court granting in part and denying in part the government's petition to enforce an Internal Revenue Summons served on Rockwell. The order placed conditions upon the enforcement of a summons for certain tax accrual papers known as a "free reserve file," which serves as a basis for calculating contingent future tax liability. Specifically, the court ordered that the file be reviewed

by an independent accounting firm (to be chosen by the IRS and paid by Rockwell) to determine its relevance to the IRS's joint civil/criminal investigation of the closing of Rockwell's Chattanooga, Tennessee plant. It is undisputed that Rockwell had understated by some 13 million dollars its income in connection with the plant closing.

At the outset, we must determine whether we have appellate jurisdiction. Arguably, the appeal is premature because the independent accounting firm has yet to be selected, and the IRS may return to the district court for relief or further action after the selected firm's review of the file, which action might itself moot the issue. However, because it is clear that the district court's order was the court's last word on the subject, leaving nothing further for the *court* to do, we conclude that the order was final, and therefore appealable under 28 U.S.C. § 1291.

Turning to the merits, we face several important questions. First, we address whether the district court erred in conditioning the enforcement of the summons on review by an independent accounting firm. We hold that the court itself must determine the relevancy of the documents. Second, we address the IRS's contention that the district court erred in determining that the purpose of the IRS's investigation was limited to investigating the Chattanooga plant closing, and not Rockwell's entire 1983 tax return. Special Agent Hackett, whose testimony was apparently credited by the district court, stated repeatedly that the joint investigation was concerned with Chattanooga only. The IRS, on the other hand, asserts that it was looking (as it clearly had the power to look) at Rockwell's entire 1983 tax return.

Although we would hesitate to conclude that the district court's finding as to the scope of the investigation was clearly erroneous as a matter of fact, we find legal error in the method employed by the district court in reaching its conclusion. More specifically, the district court erred by ignoring the overarching institutional purpose of the IRS, and by making its decision solely on the basis of a single agent's state-

ments. Under *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), the government's good (or bad) faith in pursuit of its investigation must be measured against the institutional purpose, which the IRS represents to be an investigation into the correctness of the entire 1983 return. Consequently, we will remand for the district court to determine whether the free reserve file is relevant not merely to the Chattanooga plant closing, but to the 1983 Rockwell tax return as a whole.

If the district court concludes that none of the material in the free-reserve file pertains to the 1983 tax return, that determination would appear to end the matter. However, if some of the material in the file is found to be relevant, the district court will have to address Rockwell's contention that the free reserve file was protected from disclosure by the attorney-client privilege or the work product doctrine.

We cannot review the attorney-client privilege question, however, because the district court failed to make the requisite factfindings. The court made no findings, for example, as to the source of preparation of the file documents (i.e., by accountants or lawyers), as to the precise purpose of the file, or as to who controlled it. The IRS forcefully argues that, even assuming that a privilege exists, it was waived by Rockwell's disclosure of the free-reserve file to its outside auditors. The court, however, did not make findings as to the circumstances and purpose of the disclosure and as to whether Rockwell disclosed more than necessary in order to comply with SEC strictures. Therefore, we must direct the district court on remand to make sufficient findings on these (and other) relevant points before deciding the waiver of attorney-client privilege issue. Similarly, the district court made no findings relating to the work product question. Although it appears that the file was not prepared in anticipation of any specific litigation—and that the work product doctrine may therefore be inapplicable—such a conclusion must be supported by district court findings on the circumstances of preparation and purpose of the documents.

Although we affirm in part, for the reasons stated the order of the district court must be vacated and the case remanded for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In the course of conducting its routine annual audit of Rockwell, the Internal Revenue Service stumbled across a memorandum, authored by Rockwell tax accountant Joseph Vitullo, which suggested that Rockwell had understated income on its 1983 tax return by approximately 13 million dollars by incorrectly reporting income derived from the closing of Rockwell's plant in Chattanooga, Tennessee. The memorandum also noted that documentation of the mistake could be found in Rockwell's "free reserve file." [1]

Upon discovering the memorandum, the IRS launched a joint civil/criminal investigation to determine whether Rockwell or its employees had criminally violated any tax laws with respect to the aforementioned Chattanooga plant closing.[2] The joint investigation was supervised by Special Agent Hackett of the IRS's criminal division (who was responsible for the criminal aspects of the investigation) and Revenue Agent Gerald Masters of the civil division (who was responsible for the civil aspects). The criminal investigation was concerned, *inter alia*, with a possible cover-up of the deficiency.

On November 6, 1987, Agent Hackett, under the authority of 26 U.S.C. § 7602, issued a summons pertaining to the "fiscal year ending 9/30/83," App. at 9, which demanded, *inter alia*, that Rockwell produce

[t]he account or folder containing the summary of deferred tax items in which potential tax liabilities are set aside for possible subsequent adjustments for the fiscal periods ended 9/30/82, 9/30/83, 9/30/84, and 9/30/85.

*Id.* at 10. This description refers to Rockwell's free reserve file.

Maintenance of the free reserve file allows Rockwell to calculate its contingent future tax liability by analyzing "those areas in which the taxpayer has taken a position that may, upon challenge, negotiation, or litigation, require the payment of more taxes." *United States v. El Paso Co.*, 682 F.2d 530, 534 (5th Cir.1982), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984), *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 813, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *supra* note 1. These calculations are required both by generally accepted accounting principles and by Securities and Exchange Commission regulations. App. at 80, 82–83.

In many cases, such files are prepared by accountants (both in-house and otherwise). Preparation thus does not always require consultation with an attorney. *See El Paso*, 682 F.2d at 534–35. In Rockwell's case, however, Charles C. Stoops, Jr., an attorney who serves as Rockwell's General Tax Counsel, testified that he maintains the file himself, with the assistance of attorneys and accountants acting under his direct supervision. The file is kept in Stoops's office and it may not be inspected without his permission. App. at 67. Stoops testified that, in addition to the cal-

---

**1.** The free reserve file actually consists of three files with a combined thickness of about twelve inches. App. at 191. The papers contained therein represent Rockwell's analysis of the "soft spots" in its return. In preparing its tax return, Rockwell, like all corporations, often is faced with situations in which the application of the tax code is unclear. Tax counsel resolves the issue in one manner, but records the possibility and consequences of an adverse ruling by the IRS on that issue in the free reserve file. In this way, the corporation is able to document any contingent liability that may befall it as a result of an adverse tax ruling. Also included in

the file are tax counsel's analyses as to the likelihood of any adverse rulings, as well as various negotiation and settlement positions.

**2.** There is some disagreement as to what occurred with respect to the ongoing civil audit at this time. The IRS claims that the civil audit was suspended pursuant to routine IRS procedures. Rockwell asserts that no such suspension occurred, pointing to the statements of IRS Special Agent Hackett as proof. *See* App. at 121–22, 174–75.

culations mentioned above, the file contains his mental impressions as to settlement positions, litigation strategy, and interpretation of trends in the tax law. *Id.* at 35–36. Rockwell employed the independent accounting firm of Deloitte, Haskins and Sells to serve as its outside auditors. According to Stoops, he has never surrendered the file to outside auditors, although he has discussed with them some of the contents of the file for purposes of estimating liability and exposure. *Id.* at 43–44.

Upon receipt of the summons, Stoops ordered approximately fifteen members of Rockwell's accounting and tax departments to conduct a review of the books and records pertaining to the Chattanooga plant closing. After completing the five-day investigation, Rockwell concluded that it had understated its taxable income by thirteen million dollars as a result of its tax treatment of the plant closing.[3] *Id.* at 25. Consequently, Rockwell reported the understatement to Agent Hackett and explained the reasons for the mistake.

On November 16, 1987, in response to the IRS summons, representatives of Rockwell appeared before Special Agent Hackett and surrendered to him all requested documents except the free reserve file. *Id.* at 5. Apparently concerned about the confidentiality of information within the file, Rockwell instead offered to allow Agent Hackett to review the file on Rockwell's premises, either by himself or with the assistance of a retired IRS agent or an independent accounting firm. Hackett refused the offer because it would have precluded Revenue Agent Masters from reviewing the file. Hackett testified as follows:

> There are two of us assigned to this investigation, and the information, as I understand it, is available by summons, and it is my feeling that both of us

should see the information so that we can discuss it and properly analyze it. *Id.* at 116.

Faced with Rockwell's refusal to produce the free reserve file on the IRS's terms, the government, on March 9, 1988, filed a petition in the district court for the Western District of Pennsylvania to enforce the summons. The petition was supported by Agent Hackett's affidavit, which stated that the IRS was investigating the possibility of criminal violations surrounding Rockwell's income taxes for the fiscal year ending September 30, 1983. *Id.* at 11. Rockwell defended on the grounds that the free reserve file contained nothing relevant to the Chattanooga plant closing, and that, even if it did, the documents would be protected by the work product doctrine and the attorney-client privilege.

After a hearing on the petition to enforce the summons, the district court, in a memorandum dated October 21, 1988, summarily rejected Rockwell's privilege arguments, and entered an order instructing Rockwell to pay an independent auditor (chosen by the IRS), to determine which, if any, documents in the free reserve file are relevant to the plant closing, and hence accessible by the government. The lion's share of the district court's holdings can be found in three short paragraphs. They read as follows:

> The Fifth Circuit has ruled on the vulnerability of a tax contingency file to an IRS summons. In *United States v. El Paso*, 682 F.2d 530 (5th Cir.1982), the court entertained a motion to enforce a summons for the tax pool analysis and supporting memoranda (the equivalent of the free reserve file). The court held that the information in the file was relevant, *Id.* at 537, and that the file was not shielded by the attorney-client privilege, *Id.* at 539–41, or the work-product privilege, *Id.* at 542–44.

---

**3.** Stoops summarized the nature of the error as follows:

> Instead of reducing the $13.0 million book loss for accounting purposes by $7.0 million (the difference between the book and tax basis of the disposed assets), the tax accountant erroneously increased the loss for tax pur-

poses by $6.0 million. Consequently, the federal income tax return reflected a $19.0 million reduction in taxable income instead of the appropriate decline of $6.0 million in taxable income.

App. at 26.

In light of the Fifth Circuit's finding in *El Paso,* we find that the IRS is entitled to access to relevant portions of the free reserve file. In *El Paso,* the IRS was conducting an investigation into El Paso Co.'s tax returns for 1976–1978. Consequently, the court ordered El Paso Co. to surrender the tax pool files for those years. In this case, the IRS is conducting an investigation into the closing of the Chattanooga plant, not Rockwell's entire tax returns for the relevant period of time. Therefore, it seems to this court that the IRS is entitled to access to the portions of the free reserve file relating to the closing of the Chattanooga plant.

Rockwell has offered to pay the expenses for an independent auditor to examine the free reserve files and separate any materials relating to the closing of the Chattanooga plant. This solution seems fair to this court, so we will order the IRS to select an independent accounting firm and Rockwell to pay the firm's fee.

*Id.* at 205–06. It is this order from which the government and Agent Hackett appeal, and Rockwell cross-appeals.

## II. APPELLATE JURISDICTION

As a threshold matter, we must address Rockwell's contention that this court lacks jurisdiction to entertain the government's appeal because the district court's order is not final for the purpose of 28 U.S.C. § 1291, which confers on the courts of appeals jurisdiction over "all final decisions of the district courts of the United States."

Rockwell asserts that the government's appeal is premature because the independent accounting firm could decide that the entire free reserve file is relevant, thereby insulating the government from any harm and *grooting* the issue. Further, Rockwell points to other "foreseeable possibilities" that, it argues, would necessitate the district court's continuing intervention.

With respect to Rockwell's first point, we think it clear that the harm to the government arises not from eventually being deprived of certain documents, but in being required to submit to the third-party relevancy determination in the first place. As we explain below, the government is entitled to have the *court* determine relevance. Whatever the independent accounting firm might decide, the government has been harmed by the district court's improper decision to delegate its judicial authority. On appeal, the government is asserting its right to have the district court determine relevancy. It need not await the outcome of the independent accounting firm's determinations before asserting that right.

Rockwell's second contention is that the order is not final because if the IRS is not satisfied with the accounting firm's results, the IRS can return to the district court for further proceedings. This argument is unpersuasive. An examination of the record reveals that the district court's order was intended to be its last words on the matter. The court's order does not contemplate further proceedings; rather, it states unequivocally that Rockwell "shall surrender to the Internal Revenue Service all materials determined by the accounting firm to relate to the closing of the Chattanooga plant." App. at 207. It is clear that the district court's decision was "a final judgment on the merits of the only matter before the court—the petition to enforce the summons—and there was nothing left *for the court* to do but execute the judgment." *United States v. Allee,* 888 F.2d 208, 212 (1st Cir.1989) (per curiam) (emphasis in original); *see also Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (orders of a district court judge enforcing a section 7602 summons are appealable). For a more narrow reading of *Reisman,* see *Steinert v. United States,* 571 F.2d 1105, 1107 (9th Cir.1978). We therefore find the appeal of the district court's order to be properly before us.

## III. PROPRIETY OF THE DISTRICT COURT'S ENFORCEMENT OF THE SUMMONS

Turning to the merits of the district court's decision, we are faced with three questions: (1) whether the district court

properly conditioned enforcement of the summons upon a determination of its relevance to the Chattanooga plant closing, (2) whether the district court properly delegated that determination to a private accounting firm, and (3) whether the district court erred in rejecting Rockwell's invocation of the work product doctrine and the attorney-client privilege. Although analysis of these issues necessarily involves some overlap, we shall attempt to discuss them discretely.

### A. Correctness of the District Court's Relevance Determination

■ The general question of whether IRS summonses may be enforced conditionally has been debated in the courts of appeals, with divergent results. *Compare United States v. Author Servs.*, 804 F.2d 1520 (9th Cir.1986), *modified*, 811 F.2d 1264 (1987) *with United States v. Barrett*, 837 F.2d 1341 (5th Cir.1988), (en banc) (per curiam), *cert. denied*, —— U.S. ——, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989). The Supreme Court recently faced the issue in *United States v. Zolin*, —— U.S. ——, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), but was evenly divided over a Ninth Circuit ruling that such summonses could be enforced conditionally to protect against abuse of a court's process. *See id.* at 2625; *Zolin*, 809 F.2d 1411, 1417 (9th Cir.1987).

The decisions in *Author Services, Barrett*, and *Zolin* address conditional enforcement in the context of limitations placed on the government's freedom to disclose information after it has been gathered, rather than limitations on its ability to gather information in the first place. For our purposes, this is a distinction without a difference. Our concern, as stated in *United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), is simply that the court not "permit its process to be abused." In cases where the government's action would be an abuse of process, in whatever context, the court's restrictions are not legal error; rather, they are "a wise exercise of control." *Author Servs.*, 804 F.2d at 1526. Therefore, although the decision in *Zolin* is not binding, we nevertheless think its end result (in

affirming the Ninth Circuit's decision) is sound, and we find that IRS summonses may be enforced conditionally. However, this ruling does not preclude our finding that the district court erred in conditionally enforcing the summons *sub judice.*

When the IRS summoned Rockwell, it did so pursuant to 26 U.S.C. § 7602, which provides, in relevant part, as follows:

(a) Authority to summon, etc.—For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

The jurisdiction to entertain actions to enforce such summonses is granted to the district courts by 26 U.S.C. § 7402(b). Summons enforcement proceedings are designed to be summary in nature, and their "sole purpose ... is to ensure that the IRS has issued the summons for a proper purpose and in good faith." *Barrett*, 837 F.2d at 1349.

The proper focus of such proceedings was described in *Powell,* which sets forth a four-step prima facie showing that the government must make before a summons can be enforced. *Powell* requires the government to

> show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed.

*Powell,* 379 U.S. at 57–58, 85 S.Ct. at 254–55. However, this showing does not automatically entitle the government to enforcement of the summons. The taxpayer retains the right to "challenge the summons on any appropriate ground." *Id.* at 58, 85 S.Ct. at 255 (quoting *Reisman v. Caplin,* 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964)). The teaching of subsequent decisions is that an "appropriate ground" for challenging the summons exists when the taxpayer disproves one of the four elements of the government's *Powell* showing, or otherwise demonstrates that enforcement of the summons will result in an abuse of the court's process. *See Barrett,* 837 F.2d at 1350; *United States v. El Paso Co.,* 682 F.2d 530, 536–37 (5th Cir.1982).

In the case at bar, the government satisfied its *Powell* burden by filing a petition to enforce the summons accompanied by the sworn affidavit of Special Agent Hackett. Rockwell defended against the summons by alleging bad faith investigation by the IRS and lack of relevancy, and by invoking the attorney-client privilege and the work product doctrine. Because Rockwell has not pursued the bad faith issue in its

cross appeal, we turn to the question of relevance.[4]

The district court ruled that "the IRS is entitled to access to the portions of the free reserve file relating to the closing of the Chattanooga plant." App. at 206. Rockwell asserts that this ruling was correct. The IRS argues that it should be entitled to review the entire free reserve file for the tax years involved, and that the district court improperly restricted its access. In support of its position, the government argues that the district court erred by ignoring the "institutional purpose" of the IRS and by relying on the statements of a single IRS agent to determine that the IRS was "conducting an investigation into the closing of the Chattanooga plant, not Rockwell's entire tax returns for the relevant period of time." The key to this issue is the IRS's "legitimate purpose." Apparently, the district court determined that the IRS's purpose (under the *Powell* analysis) is an investigation of the Chattanooga plant closing only. This determination was legally incorrect.

The cases decided since *Powell* have shown that the requirement of legitimate purpose means nothing more than that the government's summons must be issued in good faith pursuant to one of the powers granted under 26 U.S.C. § 7602. *See, e.g., United States v. Bisceglia,* 420 U.S. 141, 146–47, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975) ("Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose and is not meant 'to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" (citation omitted)); *United States v. Coopers & Lybrand,* 550 F.2d 615, 620

---

**4.** Although relevance seems to be the only prong of the government's *Powell* showing that Rockwell challenged *in terms,* the interrelationship among all of the *Powell* factors suggests that analysis of any one prong often involves overlap with another. For example, a discussion of relevance necessarily implicates the legitimate purpose requirement because it is that purpose to which the information must be relevant. Indeed, even a general discussion of bad faith will

often involve some analysis of the legitimate purpose prong. *Cf. Barrett,* 837 F.2d at 1356–57 (Brown, J., concurring and dissenting) ("Much of the evidence pertinent to the existence of a legitimate purpose for the summons will also be relevant to the determination of whether the disclosure of return information is necessary to obtain information that is otherwise not reasonably available." (citation omitted)).

(10th Cir.1977) (same, quoting *Bisceglia*); *see also El Paso*, 682 F.2d at 546–47 (Garwood, J., dissenting) ("Accordingly, 'such inquiry' or 'such question' is properly understood as referring to the question of 'the correctness of any return' or 'the liability of any person for any internal revenue tax.'" (quoting 26 U.S.C. § 7602(a))). We find no case requiring the government to delineate a specific and narrow purpose, and then holding that the summons will be enforced only insofar as it is relevant to that purpose. Indeed, the cases discuss not what the actual purpose is, but whether the summons was issued in good faith pursuant to a legitimate investigation—that is, an investigation authorized by section 7602.

In our view, to force the delineation of a purpose narrowly tailored to a specific suspected wrongdoing, and then to require a tight relevancy fit between the information sought and the purpose, would approach the kind of "probable cause" requirement expressly rejected in *Powell*. Consequently, we find that the district court erred by ignoring the general and overarching institutional purpose of the IRS, *see United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), and by determining relevancy as against the specific suspected wrongdoing asserted by a single IRS agent.

In this case, the statements of Agent Hackett regarding the Vitullo memorandum and the Chattanooga plant closing are properly understood not as evidence of a specific purpose, but as evidence of the government's good faith and "legitimacy" in pursuing its institutional purpose—the investigation of the correctness of returns. Because the government's purpose is the investigation of the correctness of the 1983 return, we will remand to the district court with instructions to determine the relevance of material in the free reserve file to this purpose. In making this determination, the district court should be guided by the body of case law which has defined the rather liberal standard of relevance in section 7602. Under this section, the government is entitled even to information that has only *"potential* relevance" to the investigation, *United States v. Arthur*

*Young & Co.*, 465 U.S. 805, 814, 104 S.Ct. 1495, 1501, 79 L.Ed.2d 826 (1984) (emphasis in original), and the applicable standard is whether the information sought " 'might throw light upon the correctness of the return.'" *United States v. Egenberg*, 443 F.2d 512, 515 (3d Cir.1971) (quoting *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir.1968)); *see also LaMura v. United States*, 765 F.2d 974, 981 (11th Cir.1985); *United States v. Southwestern Bank & Trust Co.*, 693 F.2d 994, 996 (10th Cir. 1982).

## B. *Delegation to Independent Auditors*

The district court's power to entertain summons enforcement actions arises from 26 U.S.C. § 7402(b), which reads as follows:

> If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data.

It is clear that " 'an Internal Revenue Service summons can be enforced only by the courts.'" *Coopers & Lybrand*, 550 F.2d at 620 (quoting *Bisceglia*, 420 U.S. at 146, 95 S.Ct. 915, 43 L.Ed.2d 88). Nevertheless, courts often "farm out" decision-making. Complicated factual disputes are routinely submitted to court-appointed experts under Fed.R.Evid. 706, to special masters under Fed.R.Civ.P. 53, to magistrates under 28 U.S.C. § 636(b)(1)(B), and to court-annexed arbitrators under 28 U.S.C. §§ 651–58. However, in such cases the court retains the ultimate decision-making authority. By leaving the relevancy determination solely up to the independent auditor, the district court's actions amounted to complete delegation, hence violating the mandate that *courts* enforce IRS summonses.

Even if the delegation were of a lesser order, there appears no ground to support

it. The task delegated to the independent auditors is surely outside the scope of Fed. R.Evid. 706, which allows experts to render an opinion on the facts of a case, but does not allow experts actually to decide the case. Alternatively Rule 53 (pertaining to Masters) may be employed "only upon a showing that some exceptional circumstance requires it," Fed.R.Civ.P. 53(b), and the Master's report must be reviewed by the court, Fed.R.Civ.P. 53(e)(2). Nor to our knowledge would the independent auditors be certified as court-annexed arbitrators under 28 U.S.C. §§ 651–58. We note generally that "[e]ven in complex litigation, use of these procedures is the exception and not the rule." *Manual for Complex Litigation Second* § 21.5 (1985).

We conclude that the delegation of the determination of relevance to an independent outside auditor was unauthorized. *Cf. Gomez v. United States*, —— U.S. ——, 109 S.Ct. 2237, 2247, 104 L.Ed.2d 923 (1989) (suggesting the Court's general reluctance to allow courts to delegate in the absence of specific statutory authority by holding that "[t]he absence of a specific reference to jury selection in the [Federal Magistrates Act], ... or indeed, in the legislative history, persuades us that Congress did not intend the additional duties clause [of the Act] to embrace th[e] function [of presiding at voir dire in a felony trial].""). Policy considerations support this view. Summons enforcement proceedings are designed to be summary in nature. *See Donaldson v. United States*, 400 U.S. 517, 529, 91 S.Ct. 534, 541, 27 L.Ed.2d 580 (1971). The determination of whether the summons was a valid exercise of IRS authority was not intended to be complex or involved. As explained *supra*, the role of the judiciary, in guarding against IRS abuse of the summons authority, is limited to a simple determination of general relevance, and the notion of relevance in this context is a loose one. Hence, the determination to be made by the district court is not a particularly rigorous task. In light of the intended summary nature of the proceedings, and the loose relevancy examination intended by Congress, we think delegation of this matter would be contrary to public policy.

C. *Attorney–Client Privilege and Work Product Doctrine*

■ It is well-settled that the IRS's summons power is "not absolute and is limited by the traditional privileges, including the attorney-client privilege." *Upjohn Co. v. United States*, 449 U.S. 383, 398, 101 S.Ct. 677, 686, 66 L.Ed.2d 584 (1981). The burden of proving the defense falls upon the party resisting enforcement of the summons. *See Powell*, 379 U.S. at 58, 85 S.Ct. at 255; *El Paso*, 682 F.2d at 538. The privilege will apply as follows:

(1) Where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection be waived.

*El Paso*, 682 F.2d at 538 n. 9 (quoting 8 J. Wigmore, *Evidence* § 2292, at 554 (J. McNaughton rev. 1961)). However, most " 'vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer.*' " *Id.* at 538 (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (emphasis in original)).

■ The district court did not make factual findings supporting its disposition of the attorney-client privilege issue. Rather, it stated only that, "in light of the Fifth Circuit's finding in *El Paso* [that similar information was not shielded by the attorney-client privilege], we find that the IRS is entitled to relevant portions of the free reserve file." The flaw in the district court's approach is that it did not find facts to support its ultimate legal determination.

The *sine qua non* of any claim of privilege is that the information sought to be shielded is legal advice. Upon remand, if the relevancy test is met, the district court must first determine whether the information in the free reserve file is legal advice. The Fifth Circuit noted in *El Paso* that "the preparation of tax returns is generally not legal advice within the scope of the privilege." *El Paso*, 682 F.2d at 539 (col-

lecting cases). However, the *El Paso* court expressly declined to rule on whether certain material collected in a free reserve file could constitute legal advice, stating: "[W]e would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgments on the outcome of litigation on it are not legal advice." *Id.*

Faced with the testimony of Mr. Stoops that Rockwell's free reserve file contained exactly the kind of material referred to in the *El Paso* decision, we hold that the district court must make specific factual findings as to the nature of the material in the free reserve file in order to determine whether it constituted legal advice for purposes of the privilege. Additionally, the district court must determine who had control of the file, as well as who was involved in its preparation. It is clear that the attorney-client privilege applies only to communications between attorney and client; the Supreme Court has held that there is no accountant-client privilege. *See Arthur Young,* 465 U.S. at 817–20, 104 S.Ct. at 1502–03.

■ Another consideration crucial to determining the applicability of the privilege is confidentiality. The attorney-client privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed. *See United States v. Bump,* 605 F.2d 548, 551 (10th Cir.1979). It has been held that the disclosure of any meaningful part of a purportedly privileged communication " 'waives the privilege as to the whole.' " *El Paso,* 682 F.2d at 538 (quoting *United States v. Davis,* 636 F.2d 1028, 1043 n. 18 (5th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981)). *But see United States v. Upjohn Co.,* 600 F.2d 1223, 1227 n. 12 (6th Cir.1979) ("[T]he corporation's voluntary disclosure to the SEC amounts to a waiver of the privilege only with respect to the facts actually disclosed."), *rev'd on other grounds,* 449 U.S. 383, 101 S.Ct. 677,

66 L.Ed.2d 584 (1981). As these cases indicate, there is some disagreement as to what effect disclosure to independent auditors (or the SEC) of information derived from a free reserve file will have in determining whether the attorney-client privilege has been waived. Indeed, there is factual disagreement in the case at bar as to what and how much of the free reserve file was revealed by Rockwell to its independent auditors and the SEC. If the district court reaches the issue upon remand, it will need to make specific factfindings in this area to facilitate our review of a difficult question.[5]

■ A final issue regarding the attorney-client privilege involves the manner in which it was asserted. Specifically, claims of attorney-client privilege must be asserted document by document, rather than as a single, blanket assertion. *See United States v. First State Bank,* 691 F.2d 332, 335 (7th Cir.1982); *El Paso,* 682 F.2d at 541. It is clear that Rockwell did not do this in the district court. However, it may well be that the hybrid nature of the district court proceedings precluded Rockwell from knowing when to assert the privilege. *See United States v. Davis,* 636 F.2d 1028, 1044 n. 20 (5th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981). Rockwell will have to raise the privilege on a document-by-document basis should the issue be reached upon remand.

■ The work product doctrine also may be asserted to defend against an IRS summons. *See Upjohn,* 449 U.S. at 397, 101 S.Ct. at 686; *El Paso,* 682 F.2d at 542; *United States v. Amerada Hess Corp.,* 619 F.2d 980, 987 (3d Cir.1980).[6] The doctrine is designed to protect material prepared by an attorney acting for his client in anticipation of litigation. *See, e.g., In re Grand Jury Proceedings,* 604 F.2d 798, 801 (3d Cir.1979). Federal Rule of Civil Procedure 26(b)(3) makes clear, however, the necessity that the materials be prepared in anticipa-

---

**5.** Rockwell also contends that it is unfair to find a waiver of privilege where it was obliged to disclose the papers in order to comply with SEC requirements. Indeed, Rockwell argues forcefully that to do so would effectively emasculate the privilege for large corporations subject to SEC disclosure standards. In view of the state

of the record, we need not consider this argument here.

**6.** The Supreme Court recently discussed the issue in *Arthur Young.* Although work product was rejected as a defense to an IRS summons in that case, Rockwell's situation is distinguishable because the Court in *Arthur Young* based its

tion of litigation, and not " 'in the ordinary course of business, or pursuant to public requirements unrelated to litigation.' " *El Paso*, 682 F.2d at 542 (citation omitted).

The question whether a document was prepared in anticipation of litigation is often a difficult factual matter. *See Id.; In re Grand Jury Investigation*, 599 F.2d 1224, 1229 (3d Cir.1979). The test, as set forth in *El Paso*, is as follows: " '[L]itigation need not be imminent ... as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation.' " *El Paso*, 682 F.2d at 542–43 (quoting *Davis*, 636 F.2d at 1040). The Third Circuit's analogous standard, formulated in the grand jury context rather than in response to an IRS summons, asks whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *In re Grand Jury Proceedings*, 604 F.2d at 803. Rockwell argues that the free reserve file is maintained to "aid Rockwell in future negotiations and litigation with the IRS." The government, on the other hand, contends that the file is maintained so that Rockwell may comply with generally accepted accounting principles and SEC reporting requirements. It will be necessary upon remand for the district court to determine with specificity Rockwell's motivation in creating and maintaining the free reserve file.

The district court must consider the other elements of the work product doctrine as well. In this case, the most obvious question to arise is whether the documents in the free reserve file were created by attorneys. Rockwell's tax counsel, Charles

Stoops, testified that he is solely responsible for the maintenance of the file, and that the documents are prepared by him and by accountants acting under his direct supervision. However, the district court made no factual findings in this regard, and it must do so upon remand.

## IV.

In summary, we conclude that the district court erred in limiting the scope of the relevancy determination to the Chattanooga plant closing, as well as in conditioning the enforcement of the summons on review by an independent accounting firm. Consequently, we will vacate the order of the district court and remand for further proceedings consistent with this opinion.

---

decision on Arthur Young and Company's position as independent outside auditors for the Amerada Hess Corporation. The Court held that:

> The *Hickman* work-product doctrine was founded upon the private attorney's role as the client's confidential adviser and advocate, a loyal representative whose duty it is to present the client's case in the most favorable possible light. An independent certified public accountant performs a different role.... The independent public accountant ... owes ultimate allegiance to the corporation's credi-

tors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretations of the client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

*Arthur Young*, 465 U.S. at 817–18, 104 S.Ct. at 1502–03.